No. 25-1460

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

ALTON ANTRIM, individually and on behalf of all others similarly situated,

      Plaintiff-Appellant,

  v.

JARED HOY, in his official capacity as Secretary of the Wisconsin Department of Corrections,

      Defendant-Appellee.

Appeal from the United States District Court for the Eastern District of Wisconsin

District Court No. 19-cv-396-bhl

Hon. Judge Brett H. Ludwig

---

## REPLY OF PLAINTIFF-APPELLANT ALTON ANTRIM

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

# TABLE OF CONTENTS

Table of Authorities ................................................................................................iv

Argument ............................................................................................................1

I.   Defendant's Brief Relies on Misrepresentations of the Facts.............................1

   A.   Defendant Incorrectly Claims that Everyone Subject to the Statute Is
        a 'Repeat' Sex Offender........................................................................1

   B.   Defendant Misrepresents the Facts Regarding Plaintiff Antrim...................2

   C.   Defendant Misrepresents the Heterogeneity of the Group of People
        Subject to Monitoring Pursuant to the Challenged Statute..........................3

   D.   Defendant Misrepresents the Evidence Regarding the Effectiveness of
        GPS Monitoring .................................................................................5

   E.   Defendant Misrepresents the Existence of Constraints on the Disclosure
        of GPS Data.......................................................................................7

   F.   Defendant Misrepresents the Relevance of 'Dark Figure' Studies ...............8

II.   Alton Antrim Is a Proper Plaintiff..................................................................10

III.   Defendant Advocates for a Deferential Standard that Is Inconsistent
       with the Fourth Amendment ...........................................................................12

IV.   The Statute Fails Constitutional Scrutiny Under the Totality of the
      Circumstances.................................................................................................14

   A.   Defendant's Argument Is Marred by Significant Legal Errors and
        Omissions ..........................................................................................14

      1.   Narrow Tailoring Is an Aspect of the Totality of the Circumstances.......14

      2.   Categorical Determinations Are Not Permissible When Constitutional .
           Rights Are At Stake.......................................................................15

      3.   The Statute Is Not Constitutional Based on a 'Diminished Expectation
           of Privacy'...................................................................................17

4.  Class Members' 'Subjective' Responses to GPS Monitoring Should Not Be Ignored ................................................................ 18

5.  Defendant's Argument Is Also Notable for What It Leaves Out ............. 19

B.  Defendant Mischaracterizes the Benefits and Burdens of Its Monitoring Program ................................................................ 20

1. Defendant Exaggerates the Benefits of the Program ................................. 20

2.  Defendant Minimizes the Burdens of the Program .................................... 22

C.  The Search Is Unreasonable Because GPS Data Is Indiscriminately Disclosed ................................................................ 23

D.  The Search Is Unreasonable Because of Its Lifetime Duration .................... 23

V.  Defendant's Misapplication of the 'Special Needs' Doctrine Should Be Rejected ................................................................ 24

Conclusion ................................................................ 27

Certificates ................................................................ 28

# TABLE OF AUTHORITIES

**Cases** Page(s)

*Belleau v. Wall*, 811 F.3d 929 (7th Cir. 2016) .................................................*passim*

*Berkemer v. McCarty*, 468 U.S. 420 (1984)........................................................18

*Carpenter v. United States*, 585 U.S. 296 (2018)....................................13, 17, 26

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000)........................................25

*City of L.A. v. Patel*, 576 U.S. 409 (2015) ........................................................11

*Commonwealth v. Feliz*, 481 Mass. 689 (2019) ................................................20

*Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1 (2003)..............................15

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001)..........................................25

*James v. Hale*, 959 F.3d 307 (7th Cir. 2020) ....................................................8

*Kansas v. Hendricks*, 521 U.S. 346 (1997)........................................................16

*Lancaster v. Nev. Dep't of Corr.*,
    3:06-cv-00284, 2010 U.S. Dist. LEXIS 101051 (D. Nev. Sep. 1, 2010) ........3

*Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1983) ......................21

*Maryland v. King*, 569 U.S. 435 (2013) ...........................................................26

*McKune v. Lile*, 536 U.S. 24 (2002)....................................................................4

*Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990)..............................26

*Park v. State*, 305 Ga. 348 (Ga. 2019)..............................................................20

*Riley v. California*, 573 U.S. 373 (2014) ...........................................................17

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989)...........................12, 26

*Smith v. Doe*, 538 U.S. 84 (2003) .....................................................................15

*State v. Grady*, 372 N.C. 509 (N.C. 2019) ....................................................17, 20

*State v. Ross,* 423 S.C. 504 (S.C. 2018) ................................................20

*Terry v. Ohio*, 392 U.S. 1 (1968)......................................................15, 18

*United States v. Kebodeaux,* 570 U.S. 387 (2013) ..............................13

*United States v. Salerno,* 481 U.S. 739 (1987) ...................................16

*United States v. Skrmetti*, 145 S. Ct. 1816 (2025).............................13

*Vasquez v. Foxx*, 895 F.3d 515 (7th Cir. 2018) ...................................13

*Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995) ..........................15, 21, 25

**Statutes**

Wis. Stat. § 301.46 (Access to Information Concerning Sex Offenders) ..........2

Wis. Stat. § 301.48
(Global Positioning System Tracking and Residency
Requirement for Certain Sex Offenders) .....................................*passim*

Wis. Stat. § 946.465
(Refusing a Global Positioning System Tracking Device)............................19

Wis. Stat. § 980.01 (Sexually Violent Person Commitments) ..........................4

**Other Authorities**

Gene G. Abel, et al.,
*Visual Reaction Time: Development, Theory, Empirical Evidence,
and Beyond*, Sex Offenders: Identification, Risk Assessment,
Treatment and Legal Issues, Oxford University Press (2021) ....................3

Ira Ellman and Tara Ellman*,
"Frightening and High": The Supreme Court's Crucial Mistake
about Sex Crimes Statistics,* 30 Const'l Commentary 419 (2015)................4

Ira Ellman,
*When Animus Matters and Sex Crime Underreporting Does Not:
The Problematic Sex Offender Registry,*
7 U. Pa. J. L. & Pub. Aff. 1 (2021) ................................................9

Stephen J. Schulhofer,
    *On The Fourth Amendment Rights of the Law-Abiding Public*,
    1989 Sup. Ct. Rev. 87 (1989).........................................................................25

## ARGUMENT

## I. Defendant's Brief Relies on Misrepresentations of the Facts

Throughout its brief, Defendant distorts and selectively cites the factual record. Plaintiff highlights below several of the most significant factual inaccuracies in Defendant's brief. This is not merely a matter of correcting the record. Because the Fourth Amendment's totality-of-the-circumstances test is inherently fact-sensitive, a proper constitutional analysis requires an accurate understanding of the facts. Correcting these misstatements is essential to ensure the Court has a sound factual foundation to evaluate Wisconsin's lifetime GPS monitoring program.

### A. Defendant Incorrectly Claims that Everyone Subject to the Statute Is a 'Repeat' Sex Offender

Defendant repeatedly refers to the class of people subject to lifetime monitoring as "repeat" offenders. *See, e.g.,* Def. Resp. at 12 ("Repeat convicted sex offenders pose a risk to public safety"); *see also id.* at 2, 19, 21, 25, 27, 37, 40, 47, 56. But it is inaccurate to refer to every person subject to lifetime GPS monitoring under §301.48(2)(a)(7) as a "repeat" offender because the statute does not require multiple, separate incidents of criminal conduct. Although §301.48(2)(a)(7) applies to individuals convicted of a sex offense "2 or more times," Wisconsin law defines "2 or more times" to include multiple convictions arising from the same incident, the same criminal complaint, and/or the same court proceeding. *See* §301.46(2m)(am). As a result, someone who committed a single act of misconduct—but was charged with and convicted of more than one count related to that act—can be deemed to have been convicted "2 or more times" and thus subject to lifetime GPS monitoring.

The term "repeat offender" implies multiple, separate acts of criminal behavior occurring at different times, which is not necessarily the case under the statute. A person with a single conviction date and no history of reoffending can still be swept into lifetime surveillance solely due to how charges were structured, not because of any ongoing risk or demonstrated pattern of offending.

## B. Defendant Misrepresents the Facts Regarding Plaintiff Antrim

Rather than engage seriously with the constitutional question of whether lifetime GPS monitoring is a reasonable search, the Department opens by reciting Mr. Antrim's decades-old convictions in lurid detail and returns repeatedly to inflammatory rhetoric meant to elicit fear and disgust. No one disputes that Mr. Antrim committed serious crimes in the 1990s. He served nearly 15 years in prison and more than five years of supervised release, which included mandatory therapy. He is also subject to lifetime sex offender registration. But, like people convicted of any other crime, people who have been convicted of sex offenses can change.

Seeking to justify lifetime GPS monitoring, Defendant distorts the record to portray Mr. Antrim as an enduring threat. In fact, his most recent evaluation undermines that narrative. On July 20, 2015, a licensed evaluator administered the Abel Assessment for Sexual Interest. The results showed that Mr. Antrim does not have a persistent sexual attraction to females aged 6–13, to females five and under, or to males of any age. The evaluator confirmed that his self-reported lack of attraction to children was supported by objective measures. ECF 102 ¶14.

Defendant seizes on a line from the report stating that Antrim displayed a "significant sexual interest" in adolescent females aged 14–17 and uses this to claim that he remains a pedophile. Def. Resp. at 5. That assertion is scientifically and legally unfounded. Research confirms that non-offending heterosexual men typically display "sexual interest in and arousal" to both adult and "adolescent female stimuli." Gene G. Abel, *et al.*, *Visual Reaction Time: Development, Theory, Empirical Evidence, and Beyond*, Sex Offenders: Identification, Risk Assessment, Treatment and Legal Issues, 191, Oxford University Press (2021); *see also Lancaster v. Nev. Dep't of Corr.*, 3:06-cv-00284-JCM-RAM, 2010 U.S. Dist. LEXIS 101051, *176 (D. Nev. Sep. 1, 2010) ("[N]ormal heterosexual adult males, based on various studies, show sexual interest in both adolescent and adult females.")

If Defendant believes that attraction to adolescent females warrants lifetime GPS monitoring, then it would have to impose ankle monitors on most adult heterosexual men. The misrepresentation of Mr. Antrim's assessment reflects a broader strategy to paint all individuals with sex offense convictions as permanently dangerous, regardless of the evidence.

## C. Defendant Misrepresents the Heterogeneity of the Group of People Subject to Monitoring Pursuant to the Challenged Statute

Defendant contends that the Court need look no further than *Belleau v. Wall*, 811 F.3d 929 (7th Cir. 2016), to conclude that lifetime monitoring of the class is constitutional. Def. Resp. at 27–31. But in *Belleau* the plaintiff was subject to monitoring pursuant to §301.48(2)(b), which requires lifetime monitoring of individuals civilly committed as "sexually violent persons"—*i.e.*, persons "convicted

of a sexually violent offense" and adjudged to "suffer[] from a mental disorder that makes it likely that [they] will engage in one or more acts of sexual violence." §980.01(7). In contrast, individuals subject to the statute challenged in this case are a heterogeneous group that encompasses persons with a wide range of conviction histories and risk levels. In an effort to liken every member of the class to the plaintiff in *Belleau*, Defendant collapses these differences, arguing that everyone subject to monitoring is dangerous and presents a high risk of recidivism. *See* Def. Resp. at 29 (citing the "dangerousness as a class" of persons with sex offense convictions and allegedly "frightening and high" rates of recidivism) (citation omitted).[1]

But Defendant can only do so by ignoring or distorting the evidence in the record. The Department has not introduced any evidence or expert testimony to rebut the core factual claims established by Plaintiff's expert and undisputed portions of the record. Specifically, the Department has not contested that individuals subject to monitoring have a low overall rate of sexual recidivism as confirmed by both Wisconsin's own data and a large body of scholarly research. *See* Plf. Br. at 11–13. Nor has it offered any evidence to challenge the expert consensus that conviction history alone is not a reliable proxy for assessing current or future risk. *Id.* at 13–14. Instead, the Department continues to rely on generalized

---

[1]     The oft-repeated statement from *McKune v. Lile*, 536 U.S. 24 (2002), that individuals with sex offense convictions recidivate at "frightening and high" rates has been thoroughly debunked. *See, e.g.*, Ira Ellman and Tara Ellman, "*Frightening and High*": *The Supreme Court's Crucial Mistake about Sex Crimes Statistics*, 30 CONST'L COMMENTARY 419 (2015).

assertions of danger and speculative appeals to the "dark figure" of unreported offenses, without confronting the actual data presented in this case.

The Department has likewise failed to rebut Plaintiff's showing that many people subject to lifetime GPS monitoring do not pose a meaningful risk of reoffending once they have completed supervision. *Id.* at 11–16. The record includes unrefuted testimony that many people subject to monitoring are low risk at the time of release; that recidivism risk declines substantially over time; and that it is feasible to distinguish, through actuarial and clinical tools, between individuals who present an elevated ongoing risk and those who do not. *Id.* at 10–11. The Department makes no effort to dispute that individualized risk assessments can easily and effectively be done (*see* Plf. Br. at 10–11), instead insisting that uniform, permanent monitoring is justified without offering any evidence that individualized assessment is impractical or ineffective. In the absence of any rebuttal evidence, the Department's continued reliance on blanket justifications cannot support the reasonableness of suspicionless, lifetime monitoring for every person with a qualifying conviction history.

## D. Defendant Misrepresents the Evidence Regarding the Effectiveness of GPS Monitoring

Defendant misrepresents the evidentiary record regarding the effectiveness of its GPS monitoring program. In its brief, the Department claims that GPS monitoring reduces recidivism and deters criminal behavior, but the studies it cites do not support that conclusion, at least not as applied to the relevant population at issue here. For example, the Department references statistics showing reductions in

parole violations and new criminal behavior among individuals on GPS monitoring. Def. Resp. at 14–15. But those studies involved individuals who were on parole and/or had been assessed as high risk using actuarial or clinical assessments. *See* ECF 84-10; ECF 84-11; ECF 83 ¶¶ 58–62. Those populations are categorically different from the individuals subject to monitoring under Wisconsin's statute, which applies to people who have completed supervision and are monitored solely based on conviction history—not individualized risk assessment.

Similarly, the Department's claim that "[t]he available information from Wisconsin supports the conclusion that GPS monitoring reduces recidivism" is speculative and unsupported. Def. Resp. at 15. The Department attempts to infer a causal relationship between GPS monitoring and low recidivism rates, but its own data undermines that claim. The Department's recidivism statistics encompass all individuals released from WDOC custody with a past sex offense conviction without distinguishing between those who were subject to GPS monitoring and those who were not. *See* ECF 89 ¶¶40–41. There is simply no basis for attributing low reoffense rates to GPS monitoring when the Department has not even attempted to isolate outcomes for the monitored population.

Making matters worse, the Department disclaims responsibility for this evidentiary gap by asserting that it hasn't been able to study the effect of GPS monitoring because the information is "relatively new" and not developed enough to allow for scientifically valid conclusions. Def. Resp. at 16 n.2. That excuse is flatly contradicted by the record. As Plaintiff noted, the Department's own 30(b)(6)

witness, Zach Baumgart, testified that the WDOC has maintained recidivism data for years but has simply never analyzed the effect of GPS monitoring. Plf. Br. at 6. Notably, the Department has had access to data for more than 19 years, yet it has made no effort to study the effectiveness of the policy it now seeks to defend. It cannot credibly claim that GPS monitoring reduces recidivism while simultaneously admitting that it has never even examined whether that is true.

### E. Defendant Misrepresents the Existence of Constraints on the Disclosure of GPS Data

The Department claims that Wisconsin minimizes the intrusion on monitored individual's privacy by applying a "balancing test" before disclosing tracking data under Wisconsin's Open Records Law. *See* Def. Resp. at 9. The Department's claim is directly contradicted by its own sworn testimony. In her Rule 30(b)(6) deposition, Deputy Director Sarah Wescott-Stilson unequivocally testified that the Department treats GPS tracking data as a public record subject to disclosure upon request— without regard to who is asking, why they are asking, or any privacy concerns of the monitored individual. *See* ECF 90-3 at 9:7-10:6; 49:4-51:4. She admitted that no subpoena or justification is needed and that she was unaware of any mechanism for individuals to prevent the release of their GPS data, even in cases of harassment or stalking. *Id.* at 52:14-20. As one of the few staff members who actually processes such requests, her testimony reflects the Department's real-world practices. *Id.* at 51:17-52:13.

Only after Plaintiff cited that testimony to argue that the Department's data-sharing practices make GPS monitoring an unreasonable search did the

Department attempt to reverse course. In a subsequent declaration, Wescott-Stilson claimed that the Department considers privacy under a "balancing test." ECF 85 ¶4. That declaration flatly contradicts her clear deposition statements. Under the sham affidavit rule, the Court should disregard this about-face. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020).

### F. Defendant Misrepresents the Relevance of 'Dark Figure' Studies

Defendant invokes the "dark figure" of unreported sexual offenses as a basis for subjecting all class members to lifetime GPS monitoring, suggesting that because many sex crimes go unreported, the risk of reoffense among people with past convictions must be substantially higher than official recidivism rates reflect. But the studies cited in the record do not support that inference. While it is true that some sexual offenses go unreported, the existence of a "dark figure" does not demonstrate that people already convicted of sex crimes, particularly those who have completed supervision, are committing undetected new offenses at high rates for decades after their release.

As Plaintiff's expert Dr. Kelly Socia explained, the Department's claims about high levels of undetected recidivism are not based on relevant studies of reoffending behavior by individuals with past convictions, but on unrelated surveys regarding unreported crime as a general matter and studies of non-representative high-risk populations. *See* Plf. Br. at 8–9. The Department did not rebut Dr. Socia's criticisms of Defendant's methodology for arriving at the conclusion that there is a high rate of

8

undetected recidivism, but instead doubled down on its speculative claims based on irrelevant data.

For example, Defendant notes that "[r]esearch has indicated that 70% to 86% of sex crimes against children are never reported." Def. Resp. at 13. From that, Defendant concludes that official recidivism statistics only capture seven out of every thousand recidivistic offenses. *Id.* But the data about unreported sexual offending on which Defendant relies for this figure relate to overall victimization rates, not to the conduct of known offenders post-release from prison. The claim that high levels of unreported offenses are being committed by individuals in the class is unsupported.

Similarly, some of the cited studies focus on self-reported behavior from incarcerated individuals—data that reflects conduct before the imposition of any monitoring, supervision, or rehabilitation rather than conduct post-release from prison and supervision. The Department states, for instance, that "73.8% of federal sexual offenders reported they had prior victims of a contact offense" Def. Resp. at 13. But this statistic has no bearing on whether individuals reoffend after release from prison and supervision, much less decades after release. Using these figures to justify lifetime GPS surveillance conflates pre-incarceration behavior with post-supervision risk.[2]

---

[2]   Contrary to Defendant's assertions, there are many reasons to conclude that persons with past convictions are substantially less likely than those without a conviction record to commit undetected sexual crimes. *See* Ira Ellman, *When Animus Matters and Sex Crime Underreporting Does Not: The Problematic Sex Offender Registry*, 7 U. Pa. J. L. & Pub. Aff. 1, 33-34 (2021) (explaining that it is "reasonable to infer that a) victims are more likely to report sexual offenses committed by perpetrators whom they know have a prior sexual

Even more importantly, the Department concedes that reliable recidivism data for the population subject to lifetime GPS monitoring does not exist. As the brief acknowledges, "[r]ecidivism rates among people on Wisconsin's lifetime GPS program have not been quantified." Def. Resp. at 16. In other words, Defendant asks this Court to uphold permanent surveillance based not on proof of actual reoffending by the class of persons subject to monitoring, but on statistical guesswork about a different population, divorced from the facts of this case. The Court should reject these efforts.[3]

In sum, while underreporting is a real concern, the record in this case offers no valid empirical basis for concluding that lifetime GPS monitoring is necessary to prevent large-scale undetected reoffending. The "dark figure" cannot substitute for actual data and cannot justify the presumption that everyone with a past conviction poses a high likelihood of future undetected recidivism.

## II. Alton Antrim Is a Proper Plaintiff

Defendant argues that Plaintiff Antrim cannot assert arguments regarding the varying risk levels posed by some members of the class because of the nature of his

---

offense conviction; b) police are more likely to follow up on reports by victims who identify the perpetrator as someone with a prior; c) police are more likely to identify and thus arrest perpetrators with prior sexual offenses; d) prosecutors are more likely to file charges and win convictions in cases in which the alleged perpetrator has a prior sexual offense conviction." And thus the rates of uncaught reoffending by persons with past convictions "relative to the rate of comparison groups, are probably lower than the studies report.")

[3]   *See Henry v. Sheriff of Tuscaloosa Cty.*, 135 F.4th 1271, 1307-08 (11th Cir. 2025) (rejecting Alabama's reliance on the "dark figure" of unreported offenses to justify a categorical ban on individuals with child sex offense convictions living with their own children, emphasizing that the mere fact that "many sexual offenses go unreported" does not justify drawing "broad legislative categories" in laws that burden constitutional rights).

own convictions. Def. Resp. at 27. The argument fails for two main reasons.

First, it misunderstands Plaintiff's challenge to the law. Antrim and the class challenge Wisconsin's GPS statute on its face, arguing it imposes an unreasonable search because monitoring is imposed for decades without individualized assessment. Thus, the claim does not depend on whether monitoring of any one individual may prove to be justified, but on the statute's failure to provide a mechanism for consideration of individual risk. *See City of L.A. v. Patel*, 576 U.S. 409, 418–19 (2015) (Plaintiffs could bring a facial Fourth Amendment challenge to a statute authorizing searches of hotel records, even though some searches conducted pursuant to the statute were justified by exigent circumstances or consent).

Second, Defendant justifies the statute based on generalizations about the recidivism risk of people subject to GPS monitoring, including individuals convicted of child pornography possession. *See* Def. Resp. at 12 ("sex offenders have a particularly high rate of reoffence.") Having relied on generalized claims about the risk posed by all persons subject to monitoring, Defendant cannot then claim that Antrim is forbidden from responding to that generalized rationale by pointing out that some class members do not fit the state's profile. *See* Plf. Br. at 14–16. In short, Defendant relies on the aggregated risk of all persons subject to lifetime monitoring to justify its program while insisting that Plaintiff is foreclosed from identifying the great variation in risk within that broad category.

## III. Defendant Advocates for a Deferential Standard that Is Inconsistent with the Fourth Amendment

In effect, the Department argues that the "reasonableness" standard under the Fourth Amendment is indistinguishable from "rational basis" review under the Fourteenth Amendment, a position that fundamentally misstates the constitutional standard. This conflation appears throughout the Department's brief in at least three ways.

First, the Department asserts that lifetime GPS monitoring should be upheld based solely on judicial deference to legislators, arguing that courts should not "second guess the legislative policy judgment" or "reweigh competing social science on an important issue involving public policy and safety." Def. Resp. at 20–22. This mirrors the language of rational basis review, where courts uphold laws so long as they are plausibly related to a legitimate government interest, regardless of evidentiary support.

Second, the Department suggests that empirical evidence of the program's efficacy and its burdens should be given little weight. It criticizes Plaintiff's reliance on social science and claims the Court should not resolve factual disagreements about the effectiveness or intrusiveness of GPS monitoring. *Id*. at 22–24. But that ignores the Fourth Amendment's requirement that courts balance the degree of intrusion on individual privacy against the actual advancement of legitimate government objectives, which necessarily demands a fact-sensitive inquiry.[4]

---

[4]  *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989) ("What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself. Thus, the permissibility of a particular practice is judged

Third, the Department supports its position by citing cases involving rational basis review under different constitutional provisions, such as *United States v. Kebodeaux*, 570 U.S. 387 (2013); *Vasquez v. Foxx*, 895 F.3d 515 (7th Cir. 2018); and *United States v. Skrmetti*, 145 S. Ct. 1816 (2025). Def. Resp. at 23–24. These decisions did not involve the Fourth Amendment, or any other constitutional right, and therefore applied far more deferential standards of review. *Kebodeaux*, for instance, considered the federal government's authority to enact a sex offender registration scheme; *Vasquez* involved a due process challenge to sex offender residency restrictions; and *Skrmetti* concerned the regulation of medical treatment under the Equal Protection Clause, none of which bear on the reasonableness inquiry that governs here.

Reasonableness under the Fourth Amendment is not a rubber stamp; it is a fact-sensitive, rights-conscious inquiry that demands judicial scrutiny of both the government's justification for the search and the extent of the intrusion on individual privacy.[5] By contrast, rational basis review all but presumes the government's action is valid, asking only whether it could be rational, not whether it is actually justified or proportionate. To protect the Fourth Amendment's core guarantee against arbitrary suspicionless searches, courts must apply the more

---

by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.") (citations omitted).

[5] *See Carpenter v. United States*, 585 U.S. 296, 305 (2018) ("our cases have recognized some basic guideposts. First, that the [Fourth] Amendment seeks to secure the privacies of life against arbitrary power. Second, and relatedly, that a central aim of the Framers was "to place obstacles in the way of a too permeating police surveillance.") (citations omitted).

rigorous balancing approach the constitution demands—not the diluted standard the Department argues for.

## IV. The Statute Fails Constitutional Scrutiny Under the Totality of the Circumstances

Defendant argues that its lifetime GPS monitoring program satisfies the totality-of-the-circumstances test because it reasonably balances the privacy interests of the class against Wisconsin's public safety goals. Def. Resp. at 32. As shown below, Defendant's argument fails for four reasons: it is marred by legal errors; it mischaracterizes the benefits and burdens of the monitoring program; the program lacks any constraints on how the data is used or distributed; and monitoring is imposed for an unreasonably long time.

### A. Defendant's Argument Is Marred by Significant Legal Errors and Omissions

#### 1. Narrow Tailoring Is an Aspect of the Totality of the Circumstances

Defendant argues that its GPS monitoring program "does not have to be narrowly tailored … to satisfy the Fourth Amendment." Def. Resp. at 40; *id.* at 21 ("The Supreme Court has rejected Antrim's contention that the program must have individualized assessment and be narrowly-tailored to a more specific group of sex offender to be reasonable under the Fourth Amendment."). The argument is overly technical and unnuanced.

Yes, it may be technically true that there is no narrow tailoring requirement under the Fourth Amendment, but case law makes clear that one of the main considerations courts employ to determine whether a programmatic warrantless

search is reasonable is whether the search is properly tailored to achieve the state's legitimate goals. Whether the state has minimized the intrusiveness of the search and whether the breadth of the search is proportionate to the state's justification is an aspect of whether the search is reasonable under the totality of the circumstances. *See Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 664-65 (1995) (suspicionless drug testing of student athletes was constitutional "[t]aking into account … the decreased expectation of privacy the relative unobtrusiveness of the search, and the severity of the need met by the search."); *Terry v. Ohio*, 392 U.S. 1, 18 (1968) (an analysis of the "reasonableness" of a search demands consideration of its "intensity and scope" in relation to the circumstances that justified its initiation).

### 2. Categorical Determinations Are Not Permissible When Constitutional Rights Are At Stake

Defendant also errs in claiming that the categorical imposition of lifetime GPS monitoring is supported by Supreme Court precedent. In particular, Defendant misreads *Smith v. Doe*, 538 U.S. 84 (2003), asserting that it stands for the proposition that individualized risk assessments are unnecessary before subjecting individuals to decades-long surveillance. *See* Def. Resp. at 42–43. But *Smith* supports no such conclusion. There, the Court upheld Alaska's sex offender registration scheme, which imposed a registration requirement on individuals convicted of sex offenses without individualized assessment, only because no constitutional right was at stake. That distinction is critical. As the Court explained in *Connecticut Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 8 (2003), decided the same day as *Smith*, constitutional rights cannot be categorically abrogated. Justice Scalia

noted: "Absent a claim... that the liberty interest in question is so fundamental as to implicate so-called 'substantive' due process, a properly enacted law can eliminate it." *Id*. (Scalia, J., concurring).

Here, by contrast, the Fourth Amendment's protection against unreasonable searches is directly at issue. The categorical imposition of lifetime GPS monitoring without individualized assessment or any procedural safeguards is out of step with Supreme Court precedent requiring robust procedures when fundamental rights are at stake. For example, in *United States v. Salerno*, 481 U.S. 739 (1987), the Supreme Court upheld pretrial detention under the Bail Reform Act only because it included extensive procedural protections: a judicial hearing, the right to counsel, the ability to present evidence and cross-examine witnesses, and a written finding that no conditions of release could reasonably assure public safety. *Id*. at 742, 750–51; *see also, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997) (civil commitment is permissible subject to strong procedural protections, including a hearing before a judge at which the state bears the burden to prove by "clear and convincing evidence" that the person to be committed "suffers from a mental abnormality … that makes it difficult, if not impossible, for the person to control his dangerous behavior.").

The government cannot rely on *Smith*, a case where no constitutional rights were directly burdened, to justify the categorical abrogation of Fourth Amendment rights without individualized findings or procedural safeguards.

### 3. The Statute Is Not Constitutional Based on a 'Diminished Expectation of Privacy'

Relying on this Court's decisions in *Belleau* and *Braam*, Defendant argues that individuals with sex offense convictions have a diminished expectation of privacy due to their inclusion on the sex offender registry—which publicly discloses their criminal history, address, and photograph—and that this diminished privacy expectation justifies lifetime GPS monitoring. Def. Resp. at 27–31, 47–48.

The argument fails for several reasons, most importantly because a reduction in privacy in one area of a person's life does not justify a loss of privacy of significantly greater magnitude in other areas. As the Supreme Court has made clear, "the fact of diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely." *Carpenter v. United States*, 585 U.S. 296, 314 (2018) (*quoting Riley v. California*, 573 U.S. 373, 392 (2014)).

Similarly, the North Carolina Supreme Court rejected the argument that registration obligations negate broader privacy interests, explaining that "[e]ven if defendant has no reasonable expectation of privacy concerning where he lives because he is required to register as a sex offender, he does not thereby forfeit his expectation of privacy in all other aspects of his daily life." *State v. Grady*, 372 N.C. 509, 531 (2019). The Court continued: "The State does not explain how defendant's provision of limited information concerning his address, employment, and appearance … meaningfully reduces his expectation of privacy in his body and in his every movement every day for the rest of his life." *Id.* (citation omitted).

### 4. Class Members' 'Subjective' Responses to GPS Monitoring Should Not Be Ignored

Citing *Terry v. Ohio*, 392 U.S. 1 (1968), and *Berkemer v. McCarty*, 468 U.S. 420 (1984), Defendant argues that class members' accounts of how GPS monitoring affects their lives "are not sufficient to support a Fourth Amendment violation" because the Fourth Amendment employs an "objective standard" that does not consider an individual's "subjective response" to a search. Def. Resp. at 49–51. The argument fails because Defendant misreads both the relevance of the cases it cites and the meaning of "objectivity" under the Fourth Amendment.

First, *Terry* and *Berkemer* are off base. *Terry* addressed whether an officer's decision to stop and frisk a suspect was supported by sufficient justification—*i.e.*, whether a reasonable officer would suspect criminal activity under the circumstances. 392 U.S. at 21. *Berkemer* concerned whether a suspect was in custody and therefore entitled to *Miranda* warnings during a traffic stop. 468 U.S. at 440. Both cases employed an objective "reasonable person" standard to assess the constitutionality of a specific, short-term encounter between a citizen and the police.

Although Defendant is correct that the Fourth Amendment's reasonableness standard is "objective," it does not follow that individual experiences are irrelevant to assessing the reasonableness of a search. Plaintiff's and class members' real-world experiences with monitoring, including the fear and stigma they suffer and the ways they adjust their lives to comply with monitoring, are evidence of the actual burdens imposed by the program, not irrational, idiosyncratic reactions. Indeed, it is reasonable for class members to take precautions in their daily lives—

such as avoiding areas with weak cell signals, altering their employment or recreational activities, and vigilantly maintaining and charging their devices— because Wisconsin criminalizes any effort to "block, diffuse or prevent" GPS signals (§946.465) and gives monitoring center employees broad discretion to involve law enforcement in suspected GPS violations. *See* ECF 89 ¶8.

Plaintiff's and class members' testimony confirms the burdensome and degrading nature of being subject to lifetime GPS monitoring and thus undermine Defendant's unsupported assertions that the burdens are trivial. *See e.g.*, Def. Resp at 2, 20, 28, 30, 48 (describing the burdens as "slight"); *id*. at 28 (describing lifetime GPS monitoring as "less intrusive than a conventional search"); *id*. 50 (claiming monitoring is "not objectively burdensome"); *id*. at 52 (calling the burdens "minimal"). Courts cannot evaluate the reasonableness of a search in the abstract. They must consider its actual effects. Plaintiff and class members' "feelings of frustration, embarrassment, and humiliation" (Def. Resp. at 51) are precisely the kinds of real-world effects the Court must consider in determining whether the search is reasonable under the totality of the circumstances.

### 5. Defendant's Argument Is Also Notable for What It Leaves Out

Defendant's argument notably ignores that the Supreme Courts of North Carolina, South Carolina, Georgia, and Massachusetts have all concluded that lifetime GPS monitoring schemes are unconstitutional. Though not binding on this Court, these four state Supreme Court cases consist of the following:

- *State v. Grady*, 372 N.C. 509 (N.C. 2019). The Court found that lifetime GPS tracking of individuals who are no longer under criminal justice supervision "based solely on their status as a 'recidivist,'" violates the Fourth Amendment;

- *Park v. State*, 305 Ga. 348 (Ga. 2019): The Court found that a state law authorizing lifetime satellite-based monitoring of individuals who have been convicted of sex offenses violates the Fourth Amendment on its face because such individuals do not have a diminished expectation of privacy after completing their criminal sentences;

- *State v. Ross*, 423 S.C. 504 (S.C. 2018): The Court found that automatic imposition of lifetime monitoring on individuals convicted of qualifying sex offenses violated the Fourth Amendment. Electronic monitoring could only be ordered after a judicial determination that monitoring was reasonable based on the totality of the circumstances in the individual case; and

- *Commonwealth v. Feliz*, 481 Mass. 689 (Mass. 2019): The Court found that automatic imposition of GPS monitoring violated the state constitution's search and seizure provision because "GPS monitoring will not necessarily constitute a reasonable search for all individuals convicted of a qualifying sex offense."

## B. Defendant Mischaracterizes the Benefits and Burdens of Its Monitoring Program

Whether a search meets the reasonableness standard "is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Vernonia*, 515 U.S. at 652. Defendant's arguments depends upon diminishing the burdens and exaggerating the benefits of the GPS monitoring program.

### 1. Defendant Exaggerates the Benefits of the Program

Defendant contends that Wisconsin's GPS monitoring program "protects the public" by "reducing recidivism" and "assist[ing] law enforcement in investigating criminal activity" (Def. Resp. at 14–16). There are two problems with Defendant's claims: (1) the program applies to many people who do not present an elevated risk

of reoffending and thus are not in need of deterrence; and (2) there is little evidence that long-term monitoring of individuals who are off supervision effectively deters sexual offending and/or assists law enforcement in any substantial way.

First, Defendant's claim that Wisconsin's program protects the public is undercut by its design, which subjects individuals to lifetime GPS monitoring who do not pose a heightened risk of recidivism. As the expert testimony makes clear, people convicted of qualifying sex offenses are not a homogenous group. Many do not present the elevated and enduring risk the law presumes. *See supra* §II(C); Plf. Br. at 13–15.

Second, Defendant offers scant evidence that the program effectively promotes public safety. *See supra* at §II(D) (noting that the studies cited by Defendant involve materially different contexts, such as monitoring high-risk individuals and those on parole); *see also* Pl. Br. at 37–42 (showing that the search does not meaningfully advance the state's interests in reducing recidivism or aiding law enforcement).

In apparent acknowledgment of this lack of support, Defendant claims that "empirical data supporting the effectiveness of Wisconsin's program is not required." Def. Resp. at 21. But courts have repeatedly held that the absence of evidence supporting a program's effectiveness weighs heavily against its reasonableness under the Fourth Amendment. *See, e.g., Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (finding that suspicionless strip searches violated the Fourth Amendment where the city failed to provide concrete evidence of their necessity: "The affidavits of the lockup personnel, which lack

specificity, suggest that only a few items have been recovered from the body cavities of women arrested on minor charges over the years.").

## 2. Defendant Minimizes the Burdens of the Program

In addition to overstating the public safety benefits of Wisconsin's GPS program, Defendant also downplays its real-world burdens. But Defendant's efforts fall flat:

1. In response to Plaintiff's point that individuals must charge their GPS devices for 2.5 hours each day (Plf. Br. at 36), Defendant notes the device takes "2–2.5 hours to fully charge" and has a 40-hour battery life (Def. Resp. at 6)—a distinction without a difference, especially given that environmental factors such as being in a remote location or working in a building with metal equipment can accelerate battery drain, and the device only alerts the wearer when only one hour of battery remains. ECF 102 ¶¶109, 138.

2. Defendant emphasizes that the device "does not record video or sound" (Def. Resp. at 8), but Defendant ignores that long-term location surveillance reveals "not only [a person's] particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter*, 585 U.S. at 311 (citation omitted);

3. Defendant claims GPS data "is not reviewed in real time" (Def. Resp. at 9), but that's simply a Departmental choice. Nothing in the statute prohibits real-time monitoring. *See* §301.48(2m). In any event, that the data is only reviewed once a day doesn't lessen the massive amount of data that is collected or the burden of wearing the device 24/7 for decades;

4. When confronted with the financial burden of monthly GPS charges (Plf. Br. at 22–23), Defendant responds that it doesn't pursue collections, while acknowledging it automatically intercepts tax refunds when available (Def. Resp. at 11); and

5. Defendant argues that "lifetime" GPS monitoring isn't truly for life because individuals may petition for removal after 20 years (*id*. at 11–12). That may be true, but 20 years of round-the-clock surveillance ain't nothing, especially when the process for petitioning for removal is financially and logistically onerous.[6]

---

[6] For example, under §301.48(6), a petition for removal will be summarily denied if the person has any conviction during the tracking period, even if for a petty offense (301.48(6)(d)(1)); and the party petitioning for removal must pay for an evaluation by a

## C. The Search Is Unreasonable Because GPS Data Is Indiscriminately Disclosed

In response to Plaintiff's argument that Wisconsin's program is unreasonable because it permits indiscriminate sharing of GPS data (Plf. Br. at 48–49), Defendant offers two points. First, it claims the state conducts a "balancing test" before releasing data in response to FOIA requests. Def. Resp. at 9. This is a post-hoc assertion contradicted by the record. *See supra* at §II(E). Second, Defendant argues there's no evidence that such a request has been made for Plaintiff or any class member. But that goes to damages, not constitutionality. For purposes of assessing the program's reasonableness, the key fact is that GPS data can be disclosed to anyone for any purpose under the program's terms.

## D. The Search Is Unreasonable Because of Its Lifetime Duration

In response to Plaintiff's contention that Wisconsin's program is unreasonable because of its duration (Plf. Br. at 48), Defendant makes two arguments, neither of which holds water.

First, Defendant contends that the lifetime duration is reasonable because "the 'real' rate of sexual reoffending is much higher [than we know]." Def. Resp. at 46. This should be rejected for three reasons: (1) not all persons with past convictions are equally likely to commit future unreported offenses, and nothing in the "dark figure" studies undermines the validity of risk assessments to differentiate between high- and low-risk individuals; (2) Defendant overestimates the rates of uncaught

---

physician or psychologist approved by the court (301.48(6)(e)), which may cost upwards of $1,800. ECF 90-1 at 45–46.

recidivism by wrongly presuming that persons with past convictions are just as likely to commit undetected crimes as persons who have never been convicted of a sexual offense; and (3) the "dark figure" articles to which Defendant cites analyze non-representative populations that cannot be generalized to the class. *See supra* at §II(F).

Second, Defendant claims that the 20-year timeline to petition for relief from monitoring "aligns with Socia's own testimony that sex offender risk declines to a 'desistance' level of no more than the general population after 20 years." *Id*. Defendant mischaracterizes Dr. Socia's testimony and the research on which it relies. Dr. Socia explained that people assessed as "very low risk" are already at desistance upon release, "below average" risk individuals reach it in 3–6 years, and "average" risk individuals in 8–13 years. Even those assessed as "very high risk" reach desistance after 18 years offense-free. *See* ECF 89 ¶45. Wisconsin law makes no distinction based on risk level, and Defendant offers no evidence that a minimum of 20 years of monitoring is appropriate for all class members.

## V. Defendant's Misapplication of the 'Special Needs' Doctrine Should Be Rejected

Defendant's argument that Wisconsin's lifetime GPS monitoring program survives Fourth Amendment scrutiny under the "special needs" doctrine is flawed for three reasons: (1) it adopts a maximalist view of what constitutes a "non-law-enforcement purpose"; (2) it ignores the scope, duration and intrusiveness of the search; and (3) it disregards the foundational purpose of the Fourth Amendment.

First, while there is ambiguity in the case law about what constitutes a "law

enforcement purpose" under the "special needs" doctrine,[7] Defendant sidesteps that nuance entirely and advances a maximalist position that collecting location data from individuals who are not on supervision with the express goal of aiding law enforcement investigations into unsolved crimes is not a law enforcement function. Def. Resp. at 53–54. That framing is unconvincing and constitutionally dangerous.

The Supreme Court has repeatedly emphasized that the "special needs" doctrine is a narrow exception and cannot apply where the "primary purpose" of a search is "the general interest in crime control." *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000). Even where the state claims additional objectives such as deterrence, treatment, or supervision, courts must still evaluate whether the "immediate objective" of the program is to gather evidence for criminal enforcement. *Ferguson v. City of Charleston*, 532 U.S. 67, 82-84 (2001). Defendant's assertion that GPS monitoring for crime-solving purposes falls outside the realm of law enforcement is Orwellian; it asks the Court to bless ongoing, suspicionless surveillance precisely because it might help police detect and prosecute criminal activity. That is the very essence of a law enforcement purpose.

Second, even if the Court agrees that GPS monitoring serves a "non-law-enforcement purpose," Defendant's position still fails because the search here is far more invasive than any search the Supreme Court has upheld under the "special needs" doctrine. Defendant claims that its program "properly balances"

---

[7]  *See, e.g.*, Stephen J. Schulhofer, *On The Fourth Amendment Rights of the Law-Abiding Public*, 1989 Sup. Ct. Rev. 87, 88-89 (1989) (describing "doctrinal incoherence" related to what constitutes a non-law-enforcement objective).

governmental and individual interests (Def. Resp. at 56), but its citations for this premise reveal how dissimilar it is from "special needs" searches the Court has upheld. The programs cited by Defendant—drug testing in *Vernonia* and *Skinner*, sobriety checkpoints in *Michigan Dep't. of State Police v. Sitz*, and DNA collection in *Green v. Berge*—all involved brief, minimally invasive procedures administered under tightly limited circumstances. Lifetime GPS monitoring is categorically different: it is a constant suspicionless location-tracking regime that enables the government to build an intimate profile of a person's movements, habits, associations, and private life. *See Carpenter*, 585 U.S. at 311. Nothing in the "special needs" line of cases supports a surveillance regime this intrusive.

Third, even if the Court agrees that GPS monitoring aids law enforcement in solving or deterring crimes, that is not the test for whether a search should be upheld. As Justice Scalia explained in dissent in *Maryland v. King*, "[s]olving unsolved crimes is a noble objective, but it occupies a lower place in the American pantheon of noble objectives than the protection of our people from suspicionless law-enforcement searches." 569 U.S. 435, 481 (2013) (Scalia, J., dissenting). The Department cannot defend a permanent search of individuals who have completed their sentences merely by pointing to speculative future benefits. That reasoning would justify surveillance of anyone so long as the state claims some predictive benefit. That is exactly the kind of reasoning the Fourth Amendment was designed to resist.

**CONCLUSION**

For the foregoing reasons and those set forth in Plaintiff's opening brief, Plaintiff

requests that this Court reverse the district court's decision.

Respectfully submitted,

/s/ Adele D. Nicholas
/s/ Mark G. Weinberg
*Counsel for Plaintiff-Appellant*

Law Office of Adele D. Nicholas
5707 W. Goodman Street
Chicago, Illinois 60630
(847) 361-3869
adele@civilrightschicago.com

Law Office of Mark G. Weinberg
3612 N. Tripp Avenue
Chicago, Illinois 60641
(773) 283-3913
mweinberg@sbcglobal.net

## CERTIFICATE OF COMPLIANCE WITH
## F.R.A.P 32(a)(7), F.R.A.P. 32(g) and C.R. 32(c)

This document complies with the type-volume limit of Seventh Circuit Rule 32 because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,960 words.

/s/ Adele D. Nicholas
*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I certify that on August 7, 2025, I electronically filed the **Reply Brief for Plaintiff-Appellant** with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Adele D. Nicholas
*Counsel for Plaintiff-Appellant*